UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TERESA R. NEWELL,

                    Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                  Defendant.

Case No. 3:09-cv-05750-BHS-KLS

REPORT AND RECOMMENDATION

Noted for December 17, 2010

      Plaintiff has brought this matter for judicial review of the denial of her application for

supplemental security income ("SSI") benefits by defendant.  This matter has been referred to

the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR

4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).

After reviewing the briefing of the parties – including defendant's motion for leave to file a

surreply and proposed surreply, as well as plaintiff's response thereto[1] – and the remaining

record, the undersigned submits the following Report and Recommendation for the Court's

review, recommending that for the reasons set forth below this matter be remanded for further

---

[1] As just indicated, following the filing of plaintiff's reply brief, defendant filed a motion for leave to file a surreply along with a proposed surreply, arguing the surreply was necessary to address two new issues plaintiff raised in her reply brief: (1) the applicability of a Social Security Ruling concerning inferring the onset date of disability, and (2) whether the prior applications for SSI benefits plaintiff filed should be re-opened. (ECF #19).  Plaintiff argues in her response to defendant's motion that no new evidence or argument was raised in her reply brief to warrant the filing of defendant's surreply. (ECF #20).  On May 28, 2010, the undersigned issued an order striking defendant's motion, stating the question of whether the surreply should be accepted would be considered with the other issues raised in the parties' briefing. (ECF #21).  The undersigned agrees with plaintiff that the filing of a surreply in this matter was unnecessary.  Accordingly, the substance of the arguments made in the surreply will not be considered here, nor will any of those presented in plaintiff's response thereto, except in the latter case specifically with respect to the issue of whether plaintiff properly presented her argument concerning re-opening in her opening brief.

REPORT AND RECOMMENDATION - 1

administrative proceedings.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff currently is 47 years old. <u>See</u> Tr. 34.  She has a general equivalency diploma and past work experience as a waitress, certified nursing assistant, maid, and personal attendant. <u>See</u> Tr. 30, 103, 105, 135, 143.  On February 12, 2004, plaintiff filed an application for SSI benefits, alleging disability as of August 1, 2000. <u>See</u> Tr. 36, 89, 460.[2]  That application was denied on initial review thereof, and plaintiff does not appear to have taken any further action in regard to that denial. <u>See</u> Tr. 36, 78.

On March 29, 2006, plaintiff filed another application for SSI benefits, alleging disability as of May 5, 2000, due to severe depression, three suicide attempts and Raynaud's disease. Tr. 18, 86, 99.  Her application was denied both on initial review and on reconsideration. Tr. 35-36, 71, 74.  A hearing was held before an administrative law judge ("ALJ") on April 14, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 458-501.

On June 10, 2009, the ALJ issued a decision, in which she determined plaintiff to be not disabled since March 29, 2006 – the date her most recent application for SSI benefits was filed[3] – finding specifically in relevant part that:

(1)   at step one of the sequential disability evaluation process,[4] plaintiff may
        have engaged in substantial gainful activity since May 29, 2006;

---

[2] Apparently, another previous application was filed in 2002, as well, but a copy of that application does not appear to be contained in the record before the Court. See Tr. 460.

[3] An application for SSI benefits of a claimant who is found eligible therefor is "effective on the later of . . . the first day of the month following the date" the application is filed, or on "the first day of the month following the date" the claimant becomes eligible for SSI benefits. 42 U.S.C. § 1382(c)(7); see also 20 C.F.R. §§ 416.330, 416.335.  As the ALJ thus noted, "[a]t issue" in this case for the purpose of determining whether plaintiff was entitled to SSI benefits is "the period beginning on March 29, 2006." Tr. 18.

[4] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION - 2

(2)   at step two, plaintiff had a "severe" impairment consisting of arthralgias;

(3)   at step three, plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)   after step three but before step four, plaintiff had the residual functional capacity to perform the full range of light work;

(5)   at step four, plaintiff was able to perform her past relevant work as a personal attendant; and, in the alternative,

(6)   at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 18-31.  Plaintiff's request for review was denied by the Appeals Council on October 19, 2009, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

On December 3, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (ECF #1-#3).  The administrative record was filed with the Court on February 22, 2010. (ECF #12).  Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits for the following reasons:

(a)   the ALJ erred in not finding plaintiff's asthma/bronchitis/allergies, fibromyalgia, right knee arthritis, Raynaud's disease, urinary incontinence, depression, and anxiety to be severe impairments;

(b)   the ALJ erred in evaluating the opinions of plaintiff's treating, examining and reviewing medical sources;

(c)   the ALJ erred in assessing plaintiff's credibility;

(d)   the ALJ erred in finding plaintiff could return to her past relevant work as a personal attendant; and

(e)   the ALJ erred in finding plaintiff to be capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the

REPORT AND RECOMMENDATION - 3

reasons set forth below, recommends that although the ALJ's decision should be reversed, this matter should be remanded to defendant for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if he applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>See</u> <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>See</u> <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. <u>See</u> <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.     <u>Plaintiff's Prior Applications</u>

Defendant may apply administrative *res judicata* "to bar reconsideration of a period with respect to which she has already made a determination, by declining to reopen the prior application." <u>Lester v. Chater</u>, 81 F.3d 821, 827 (9th Cir. 1996). In general, defendant's refusal to reopen a decision regarding an earlier period "is not subject to judicial review." <u>Id.</u> This is because, once an administrative decision becomes final, defendant's decision to re-open a disability claim is "purely discretionary." <u>Taylor v. Heckler</u>, 765 F.2d 872, 877 (9th Cir. 1985). Further, since a discretionary decision is not a "final decision" within the meaning of 42 U.S.C. § 405(g), defendant's refusal to reopen that decision "is not a 'final' decision subject to judicial review." <u>Id.</u> (citations omitted).

REPORT AND RECOMMENDATION - 4

The doctrine of *res judicata*, however, "should not be rigidly applied in administrative proceedings." Lester, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (*res judicata* applied less rigidly to administrative proceedings than to judicial ones).  On the other hand, while administrative *res judicata* also should not be "applied so as to 'contravene an overriding public policy or result in manifest injustice,'" it is only "[w]here the record is patently inadequate to support the findings the ALJ made," that its application will be "tantamount to a denial of due process." Krumpelman v. Heckler, 767 F.2d 586, 588 (9th Cir. 1985) (quoting Thompson v. Schweiker, 665 F.2d 936, 940-41 (9th Cir. 1982)).

The Commissioner's regulations do "allow for further consideration of an application by providing for the reopening of an agency determination." Panages v. Bowen, 871 F.2d 91, 92 (9th Cir. 1989).  Under those regulations, "[a] claim may be reopened within 12 months of the initial determination as a matter of right, within four years 'upon a finding of good cause,' and at any time for the purpose of correcting clear evidentiary errors or clerical mistakes." Id. (quoting and citing 20 C.F.R. §§ 404.988-404.989).  In addition, "where the Commissioner considers 'on the merits' the issue of the claimant's disability during the already-adjudicated period," then "a de facto reopening" will be deemed to have occurred, and "the Commissioner's decision as to the prior period [will be] subject to judicial review."  Lester, 81 F.3d at 827; see also Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001).

As noted above, the ALJ stated in his decision that "[a]t issue is the period beginning on March 29, 2006, the date of the current [SSI benefits] application." Tr. 18.  At step two of the sequential disability evaluation process – discussed in more detail below – in regard to plaintiff's depression and anxiety, the ALJ reiterated that at issue in this case was "solely" this period, and that prior thereto while plaintiff "underwent some mental health treatment for" those conditions,

REPORT AND RECOMMENDATION - 5

1    "all of her mental symptoms . . . were directly tied to her polysubstance use." Tr. 22.  The ALJ

2    then went on to discuss the evidence in the record concerning plaintiff's depression and anxiety

3    both during and after March 29, 2006, specifically finding them to be non-severe. See Tr. 22-25.

4        In her opening brief, plaintiff challenges the propriety of the ALJ's findings in regard to

5    the specific step two non-severity determination concerning her depression and anxiety, but she

6    made no mention or argument relating to seeking to re-open any of the prior applications. See

7    (ECF #14, pp. 15-19).  In his response to plaintiff's step two arguments, defendant discussed the

8    findings of the ALJ concerning both periods, specifically arguing that the ALJ's determination as

9    to the relevant period – i.e., that subsequent to March 26, 2009 – was proper. See (ECF #16, pp.

10   12-15).  Then, in her reply brief, plaintiff states that defendant "now argues that it was proper for

11   the ALJ to reject all evidence of mental impairments prior to" that date, asserting that argument

12   lacks merit because the application for SSI benefits she filed on February 12, 2004, should have

13   been reopened in light of the fact that she "filed a new application within two years of the initial

14   denial" thereof, "alleged an onset date within the previously adjudicated period" and "submitted

15

16

17   new and material evidence which constitutes good cause." (ECF #17, pp. 7-8).

18       In her response to defendant's surreply, plaintiff contests defendant's assertion that it was

19   in her reply brief that she raised for the first time the issue of an implied re-opening of her prior

20   application. See (ECF #20, p. 5-7).  Rather, plaintiff asserts, she "simply responded to an issue

21   that had be[en] raised and had been incompletely analyzed by [defendant] in his" response brief.

22   (Id. at pp. 5-6).  The undersigned disagrees.  There is a big distinction between what defendant

23   did in his response brief – merely arguing the ALJ properly considered the evidence in the record

24   regarding the period the ALJ found to be at issue in this case – and actually raising the issue of a

25   de facto or implied re-opening.  Defendant clearly did the former, and not the latter.  Indeed, no

26

mention of a *de facto* or implied re-opening is made anywhere in defendant's response brief, nor would there be any logical reason for him to do so there.[5]

Even if plaintiff can be said to have properly raised this issue in his opening brief – or, if as asserted by plaintiff in her reply brief, it was first broached by defendant in his response brief – the undersigned finds no *de facto* or implied re-opening actually has happened.  While as noted above, a *de facto* re-opening will have occurred where defendant "considers 'on the merits' the issue of the claimant's disability during the already-adjudicated period," where such a discussion "is followed by a specific conclusion that the [issue] is [being] denied on res judicata grounds," then defendant's "decision should not be interpreted as re-opening the claim." Lester, 81 F.3d at 827; see also Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001); Krumpelman, 767 F.2d at 589 (citing McGowen v. Harris, 666 F.2d 60, 68 (4th Cir. 1981)).  In that event, the decision to apply administrative *res judicata* is "not reviewable." Krumpelman, 767 F.2d at 589.

Here, at the start of her decision and immediately after noting the period at issue was that "beginning on March 29, 2006," the ALJ expressly stated that while she would "discuss evidence that [had] already been adjudicated in prior applications," she would "do so for the sole purposes of assessing credibility." Tr. 18 (emphasis added).  And, as previously noted, the ALJ throughout her decision repeatedly commented that the relevant time period for consideration of the issue of

---

[5] Plaintiff asserts the following section of defendant's response brief expressly put the issue of a *de facto* or implied re-opening directly in issue:

> [. . .] Although Plaintiff alleged disability since May 2000 (Tr. 131), she was ineligible for SSI disability benefits for any month preceding March 2006, the month she filed her SSI application. 20 C.F.R. §§ 416.330, 416.335; Social Security Ruling (SSR) 83-20, *available at* 1983 WL 31249.  Therefore, the relevant period of time under adjudication is March 2006 (the month of Plaintiff's current application) through June 10, 2009 (the date of the ALJ's decision). [. . .]

(ECF #20, p. 5 (quoting (ECF #16, p. 4 (emphasis added))).  But this language is merely pointing out the regulatory parameters governing the period for which SSI benefits may be received, which have been noted above as well, and echoes what the ALJ herself found the relevant time period to be, namely that subsequent to March 26, 2009.  Once more, nothing in the above quoted language refers to or concerns the specific issue of whether a *de facto* or implied re-opening had occurred.  In other words, these are entirely two different issues.

REPORT AND RECOMMENDATION - 7

plaintiff's disability in this case was that beginning on the date of plaintiff's most recent benefits application. Accordingly, the ALJ made it clear she intended only to consider that period of time and was not in fact exercising her discretion to re-open an earlier claim.[6] Thus, the Court should decline to find plaintiff's prior applications have been re-opened.

## II.   The ALJ's Step Two Analysis

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. See Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff's arthralgias to be severe at step two, but did not

---

[6] Plaintiff appears to argue as well that if a claimant files a new application within the regulatory time limits, alleges an onset date within the previously adjudicated period and submits what the claimant deems to be new and material evidence, then a prior application must be re-opened. As noted by defendant, however, the regulations and case law governing re-openings clearly place the decision to re-open – or not – within the discretion of defendant, or as in this case, the ALJ. Indeed, plaintiff herself admits that 20 C.F.R. § 416.1488(b) states that a prior final decision "may be reopened." (ECF #17, p. 7 (quoting id.)).

REPORT AND RECOMMENDATION - 8

find any of her other alleged impairments to be severe, including her asthma/bronchitis/allergies,

fibromyalgia, right knee pain, Raynaud's disease, urinary incontinence, depression, and anxiety.

See Tr. 21-25.  While plaintiff argues the ALJ erred here, the undersigned finds that to be so only

in regard to plaintiff's asthma/bronchitis/allergies.

  A.  <u>Plaintiff's Asthma/Bronchitis/Allergies</u>

  In regard to these alleged impairments, the ALJ found in relevant part:

> The claimant has a history of asthma.  However, in October 2007, a
> pulmonary function test was completely normal (Exhibit 20F/48).  Also, in
> December 2008, her asthma was considered quiescent (Exhibit 22F/13).  I
> therefore find that the claimant's asthma is non-severe.

Tr. 21.  In challenging these findings, plaintiff first asserts the October 2007 pulmonary function

test actually showed she had "[d]ecreased [d]iffusing [c]apacity," and thus was not "completely"

normal as the ALJ stated. Tr. 362.  While perhaps true in a technical sense, there is no indication

in the report concerning this pulmonary function test that such a decrease in plaintiff's diffusing

capacity actually resulted in any work-related limitations.  Accordingly, any error on the part of

the ALJ here was harmless. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050,

1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's

ultimate disability conclusion).

  For the same reason, while it may be that "quiescent" does not necessarily mean that the

condition is gone for good, it also does not indicate the presence of a severe impairment.  That is,

again no specific work-related limitations have been shown to stem therefrom.  Nevertheless, the

undersigned does agree, as discussed in further detail below, that the ALJ erred in evaluating the

opinion of Robert Hoskins, M.D., a non-examining, consulting physician, who assessed plaintiff

for the "current" period in early December 2006, and who found she should avoid concentrated

exposure to fumes, dusts, gases, poor ventilation and the like, based in part on noted diagnoses of

REPORT AND RECOMMENDATION - 9

1   chronic allergies and bronchitis. See Tr. 226, 230, 233.  The record, accordingly, contains at least

2   some evidence of a more than *de minimis* work-related limitation in this area, and, therefore, it is

3   not entirely clear plaintiff's asthma/bronchitis/allergies condition is non-severe.

4          B.       Plaintiff's Fibromyalgia

5          In terms of plaintiff's fibromyalgia, the ALJ found that:

7          At the hearing, the claimant testified that she had been receiving medical
           marijuana for the past two years to treat fibromyalgia.  However, the record
8          contains no reference to fibromyalgia until April 2008, more than a year after
           she allegedly started getting medical marijuana.  Even then, the impairment
9          was something that she speculated that she had.  For instance, in April 2008,
           she presented to an examination, complaining of muscle aches and spasm.
10         She reported being concerned that she might have fibromyalgia (Exhibit
           22F/36).  In February 2009, she described having generalized body aches and
11         multiple trigger points.  She stated that, in her opinion, she met the criteria for
           fibromyalgia.  Although Robert Epstein, M.D., noted multiple trigger points in
12         the claimant's back and joints on examination, it is unclear whether she had
           the necessary 11 out of 18 positive tender points for a diagnosis of
13         fibromyalgia (Exhibit 23F/34[).]

14

15         Because the claimant has never undergone a formal rheumatological
           evaluation and there are insufficient tender point findings, I find that
16         fibromyalgia is not medically established.

17   Tr. 21.  With respect to the ALJ's last statement above, plaintiff argues correctly that there is no

18   requirement that a claimant first undergo such an evaluation to be diagnosed with fibromyalgia.

19   The undersigned thus agrees it was error for the ALJ to essentially require one here.  It also was

20   error for the ALJ to reject Dr. Epstein's fibromyalgia diagnosis on the basis that it was "unclear

21   whether she had the necessary 11 out of 18 positive tender points." Id.

22         The Ninth Circuit has noted with apparent approval the Seventh Circuit's description of

23   fibromyalgia:

24
25         [fibromyalgia's] cause or causes are unknown, there is no cure, and, of
           greatest importance to disability law, its symptoms are entirely subjective.
26         There are no laboratory tests for the presence or severity of fibromyalgia. The
           principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and

REPORT AND RECOMMENDATION - 10

> "the only symptom that discriminates between it and other diseases of a
> rheumatic character" multiple tender spots, more precisely 18 fixed locations
> on the body (and the rule of thumb is that the patient must have at least 11 of
> them to be diagnosed as having fibromyalgia) that when pressed firmly cause
> the patient to flinch.

Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001) (quoting Sarchet v. Chater, 78 F.3d 305,

306 (7th Cir. 1996)).  But, as noted above, Dr. Epstein himself diagnosed her with that condition,

and, as pointed out by plaintiff, the ALJ has not shown she is more qualified than Dr. Epstein, a

licensed physician, to make that diagnosis. See Gonzalez Perez v. Secretary of Health and

Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for

findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712

F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent

medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (same); Benecke v.

Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (error for ALJ to discount opinions of treating

physicians by relying on own disbelief of claimant's symptom testimony and misunderstanding

of fibromyalgia).

      The undersigned also agrees with plaintiff that to the extent the ALJ deemed the basis of

the fibromyalgia diagnosis to have been "unclear", she was required to develop the record further

by re-contacting Dr. Epstein. See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)

(ALJ has duty to fully and fairly develop record and assure claimant's interests are considered);

see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (duty to further develop record

triggered when there is ambiguous evidence or when record is inadequate to allow for proper

evaluation of evidence); 20 C.F.R. § 416.912(e)(1) (stating that when medical source opinion is

inadequate to determine whether or not claimant is disabled, that source is to be re-contacted to

seek additional evidence or clarification, when that opinion contains conflict or ambiguity that

REPORT AND RECOMMENDATION - 11

must be resolved, does not contain all necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques).

The ALJ thus erred in finding plaintiff's fibromyalgia to not be a medically determinable impairment. That being said, the undersigned again finds the ALJ's errors here to be harmless, as plaintiff has failed to point to any evidence in the record, nor does there appear to be any, that her fibromyalgia diagnosis – to the extent it is a medically determinable impairment – resulted in actual work-related limitations. Indeed, neither Dr. Epstein nor Emily Glasscok, A.R.N.P., her other treating source, assessed any such limitations despite their diagnoses of fibromyalgia. See Tr. 361, 400-01, 418-19, 421-26. Nor has any other medical opinion source in the record for that matter, let alone concurred in the diagnosis. As such, the record supports the ALJ's ultimate step two determination that her fibromyalgia does not constitute a severe impairment, given that there is no indication therein that this condition has had any significant impact on plaintiff's ability to perform basic work activities.

C.   Plaintiff's Right Knee Pain

With respect to plaintiff's right knee pain, the ALJ found in relevant part as follows:

The claimant has injured her right knee on a couple of occasions. For instance, in April 2005, she was seen after twisting her right knee (Exhibit 16F/6). X-rays that month, however, were negative (Exhibit 16F/10). In May 2008, she was again seen for right knee pain after tripping over something and falling down. In July 2008, an MRI of the right knee showed evidence of early arthritis and no meniscal injury (Exhibit 22F/27). On examination in August and September 2008, Robert Epstein, M.D., noted that the claimant's right knee appeared stable (Exhibits 22F/25, 27). Given the unremarkable radiographic and examination findings, I conclude that the claimant's right knee pain is non-severe.

Tr. 21. Plaintiff argues MRI findings indicating the presence of early arthritis and "findings of chronic right knee pain" in the record call into question the ALJ's non-severity conclusion here. See (ECF #14, p. 14). In regard to the above MRI findings, however, "[t]he mere existence of an

REPORT AND RECOMMENDATION - 12

1  impairment is insufficient proof of a disability," or in this case, a severe impairment. <u>Matthews</u>

2  <u>v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993).  The same is true for the "findings of chronic right

3  knee pain" contained in the record. <u>See</u> Tr. 404, 415, 417, 419, 422, 424.  Accordingly, there is

4  no error here.

5          D.      <u>Plaintiff's Raynaud's Disease</u>

6          The ALJ found that although plaintiff "reported a history of Raynaud's syndrome," it did

7  not constitute a severe impairment, "because medical records since March 2006 document[ed] no

8  complaints or treatment for symptoms related to" that condition. Tr. 22.  Plaintiff argues error on

9  the part of the ALJ here, because Dr. Epstein noted Raynaud's syndrome in her "Major Problem

10  List" on more than one occasion (<u>see</u> Tr. 331, 335, 337, 339), and because "there would be no

11  reason for [him] to continually address these complaints, when a diagnosis ha[d] already been

12  established, and the first line of treatment is avoiding the source of cold or stress that causes the

13  problem." (ECF #14, p. 14).  Plaintiff's arguments are without merit.

14          First, the "Major Problem List" is located within the subjective/patient history section of

15  the treatment notes Dr. Epstein wrote. <u>See also</u> Tr. 323.  Mere listing of a problem or patient's

16  history, however, is insufficient to establish severity at step two. <u>See</u> 20 C.F.R. § 416.929(a)

17  (indicating statements regarding claimant's medical history from treating or other source do not

18  constitute objective medical evidence).  Second, once more the mere existence of an impairment

19  or diagnosis also is insufficient to demonstrate severity.  Lastly, the mere fact that the first line of

20  treatment may be to avoid the potential cause of the condition – a finding, it should be noted, that

21  was not made by Dr. Epstein – again gives no indication the extent to which, if any, plaintiff's

22  Raynaud's disease affected her ability to perform basic work activities, whether or not treatment

23  therefor would be noted in the record.  Rather, as the ALJ properly noted, that condition appears

REPORT AND RECOMMENDATION - 13

not to have had any effect thereon.

E.     Plaintiff's Urinary Incontinence

In regard to plaintiff's urinary incontinence, the ALJ found that:

In October 2007, the claimant complained of urinary incontinence with coughing or straining (Exhibit 20F/9).  In January 2008, she underwent a hysterectomy with cystocele repair (Exhibits 21F/5, 22F/43).  Postoperative records in January and February 2008 indicate that she was healing well and that her urethra and bladder were well supported (Exhibit 21F/3, 4, 12).  Because medical records for the rest of 2008 through February 2009 document no recurrence of symptoms, I find that the claimant's urinary incontinence successfully resolved with surgery and is therefore non-severe (Exhibit 22F).

Tr. 22.  Plaintiff argues that although the surgery in January 2008, may have been successful, the ALJ "completely failed to address the period of time before the surgery," which she asserts shows her urinary incontinence had been "much worse" since mid-December 2006, after giving birth, she had to wear pads for that condition during both the day and the night and she "would leak on the way to the bathroom." (ECF #14, p. 15 (quoting Tr. 382, citing Tr. 389)).  As such, plaintiff argues this is not a frivolously claimed condition, demonstrated at least in part by her need to for corrective surgery.  Again, the undersigned disagrees.

Nothing in the record establishes that any problems or complaints plaintiff had in regard to her urinary incontinence prior to her surgery, had impacted her ability to perform basic work activities to more than a *de minimis* extent.  The fact that plaintiff's "problems of urinary stress incontinence" were noted to have "been much worse since" giving birth in mid-December 2006, by itself indicates nothing about any such actual impact. Tr. 382.  Nor does mere documentation of the need to have corrective surgery performed or to wear pads, whether during the day or at night.  In addition, while the record does show plaintiff reported leaking "on the way to the bathroom," such leaking appears to have occurred only at night. Tr. 389 ("She has nocturia 2-3

REPORT AND RECOMMENDATION - 14

times per night.").[7]  Thus, none of these facts, either singly or in combination, are sufficient for

the purpose of establishing severity at step two.

F.     Plaintiff's Depression and Anxiety

As discussed above, the ALJ properly noted that "at issue" in this matter "is solely" that

period of time "beginning on March 29, 2006, the date of the current application." Tr. 22.  In

addition, the ALJ found in relevant part that although plaintiff "underwent some mental health

treatment for anxiety and depression . . . all of her mental symptoms during the prior period were

directly tied to her polysubstance use." Id.  The ALJ went on to determine that based on both the

credible medical evidence in the record and on the lack of plaintiff's own credibility concerning

her mental symptoms and complaints, plaintiff had at most only mild limitations in her ability to

function mentally, and therefore had no severe mental impairment. See Tr. 23-25.

Plaintiff argues the ALJ erred in finding her mental health symptoms prior to the relevant

time period were directly tied to her polysubstance use.  The undersigned agrees that the record

does not definitively show all of plaintiff's mental health problems were clearly or only the result

of her polysubstance abuse during the period prior to March 29, 2006.  However, as discussed

above, because the prior determinations regarding the applications covering that period are final

---

[7] Plaintiff argues in her reply brief that defendant's assertion that the ALJ could not have found severe her urinary incontinence impairment until she visited a specialist for this problem in October 2007, is contrary to SSR 83-20, 1983 WL 31249, which provides that "[f]or disabilities of traumatic origin, onset is the day of the injury," which in this case, plaintiff further argues, would be her child birth. (ECF #17, p. 6 (quoting id. at *2).  As indicated above, this is one of the issues defendant argued plaintiff raised for the first time in her reply brief.  As clearly can be seen, however, plaintiff raised this issue, albeit incorrectly as discussed below, solely in response to one of the arguments defendant presented in his response brief.  The undersigned thus finds it properly may be considered here.

SSR 83-20, as noted by plaintiff, sets forth defendant's policy when establishing a claimant's onset date of disability.  That ruling comes into play, however, only after the claimant first has met his or her "ultimate burden" of establishing disability prior to the expiration of his or her insured status. Armstrong v. Commissioner of the Social Security Administration, 160 F.3d 587, 590 (9th Cir. 1998).  In other words, it is only when the claimant has proven he or she is disabled and the evidence in the "record is ambiguous as to the onset date of disability," does SSR 83-20 require an ALJ to "assist the claimant in creating a complete record" that "forms a basis for" establishing a disability onset date. Id.  Such is not the case here for the reasons discussed herein.

and no *de facto* or implied re-opening thereof has occurred, any error on the part of the ALJ here is harmless.  Plaintiff further argues the ALJ erred in attempting to impeach her credibility, but as discussed in greater detail below, the ALJ committed no error in doing so.  In addition, since, as explained in greater detail below, the ALJ did not err in evaluating the medical evidence in the record concerning plaintiff's mental impairments, the ALJ did not err in finding no severe mental impairment for the period subsequent to March 29, 2009, as well.

III.  The ALJ's Evaluation of the Medical Opinion Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility."  Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the evidence."  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

REPORT AND RECOMMENDATION - 16

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

Plaintiff argues the ALJ erred in not giving any reasons – other than to note she had not been completely truthful regarding her recent involvement with drugs – for rejecting the early September 2004 opinion of Glade Birch, Ph.D., who concluded that her mental impairments and moderate to severe functional limitations stemming therefrom, resulted in her essentially being

REPORT AND RECOMMENDATION - 17

incapable of working. See Tr. 23, 302-08.  The ALJ, however, was not required to provide any

reasons for rejecting Dr. Birch's conclusions, given that the opinion concerned the closed period

prior to March 29, 2006.  Thus, again, any error the ALJ committed here was harmless.  For the

same reason, the ALJ was not required to provide any reasons for rejecting, or even discuss, the

late September 2004 opinion of J. Davidson, M.D., that plaintiff appeared to meet the Social

Security criteria for severity in terms of her mental impairments and polysubstance abuse, the

sedentary to severe work limitations assessed by David Kanters, A.R.N.P., in early March 2004,

and by Lois Carey, A.R.N.P., in late August 2004. See Tr. 202, 311, 314.

Plaintiff also challenges the ALJ's findings concerning the mental functional limitations

assessed by Thomas Clifford, Ph.D., which read as follows:

> . . . In December 2006, the State agency psychological consultant, Thomas
> Clifford, Ph.D., found that the claimant had major depressive disorder, PTSD,
> and dependent personality disorder.  In "Part B" of the psychiatric review
> technique form, the psychological consultant opined that the claimant had
> mild restriction of activities of daily living, moderate difficulties in
> maintaining social functioning, moderate difficulties in maintaining
> concentration, persistence, or pace, and no episodes of decompensation
> (Exhibit 12F).  Dr. Clifford opined that the claimant could perform simple,
> repetitive tasks and interact with supervisors and coworkers.  This opinion
> was affirmed by another State agency psychological consultant in August
> 2008 (Exhibit 13F).
>
> I reject the State agency opinion.  First, all of the evidence regarding the
> claimant's depressive and anxiety symptoms occurred prior to March 2006, a
> time when the claimant was chronically abusing substances.  Since March
> 2006, which is the period at issue, the claimant has undergone no mental
> health treatment.  Also, medical records during this period indicate that she
> consistently presented to examinations with normal mental status.  Second,
> her activities suggest that she is functionally [sic] fairly well from a mental
> health standpoint.  She lives with her three year old daughter in an apartment,
> cares for her personal needs and the needs of her young child, has friends,
> visits family, manages her finances, reads daily, and uses public
> transportation.  In 2008, she worked as a personal companion to an elderly
> gentleman in his 80s.

Tr. 24.  Plaintiff argues the reasons the ALJ sets forth above are the same generic ones she used

REPORT AND RECOMMENDATION - 18

for rejecting her mental impairments as non-severe at step two.  The undersigned, though, finds the ALJ's reasons here instead to be specific and legitimate.

As noted by the ALJ, plaintiff has not undergone any mental health treatment during the relevant time period. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ in discounting claimant's credibility in part due to lack of consistent treatment, and noting fact that claimant's pain was not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was powerful evidence regarding extent to which she was in pain); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for not seeking treatment can cast doubt on sincerity of claimant's pain testimony); Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered failure to request serious medical treatment for supposedly excruciating pain).  It is true that the fact that a claimant does "not seek treatment for a mental disorder until late in the day" has been found to be not a proper basis upon which to find a claimant not credible regarding that condition. Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting that those with depression often do not recognize their condition reflects potentially serious mental illness); see also Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir.1989) (holding invalid rejection of claimant's assertions regarding his depression due to failure to seek psychiatric treatment, finding questionable practice of chastising one with mental impairment for exercise of poor judgment in seeking rehabilitation).

Here, however, there is no indication in the record that plaintiff failed to seek treatment due to impaired judgment or inability to recognize her mental condition, rather than because she was not in need of it.  Plaintiff argues that she has been noted to have poor insight and judgment by her medical sources on more than one occasion, but these observations either occurred during the closed period not at issue here and/or fail to establish that plaintiff's restricted ability in these

functional areas was such as to impair her actual ability to recognize her condition or seek help for it. See Tr. 186, 276, 305.  Accordingly, the ALJ did not err in relying on this reason in part to reject Dr. Clifford's opinion.

Given that, again as discussed in further detail below, the ALJ properly found plaintiff to be less than fully credible based in part on her reported activities of daily living, the ALJ also did not err in rejecting Dr. Clifford's opinion based in part on those activities as well. See Morgan v. Commissioner of Social Sec. Admin., 160 F.3d 595, 601-02 (9th Cir. 1999) (upholding rejection of physician's conclusion that claimant suffered from marked limitations in part on basis that other evidence of claimant's ability to function, including reported activities of daily living, contradicted that conclusion); Magallanes v. Bowen, 881 F.2d 747, 754 (9th Cir. 1989) (finding ALJ properly rejected one physician's opinion in part on basis that it conflicted with both other medical evidence in record and plaintiff's own subjective pain complaints).

Lastly, and perhaps most significantly, as noted by the ALJ, the record for the period of time subsequent to March 29, 2006, shows plaintiff's mental status overall to be fairly normal. See Tr. 316, 333, 340, 397, 400, 404, 410, 413; see also Batson, 359 F.3d at 1195 (ALJ need not accept opinion of treating physician if it is inadequately supported by record as whole); Thomas, 278 F.3d at 957 (9th Cir. 2002); Tonapetyan, 242 F.3d at 1149.  Thus, the ALJ did not err in not adopting the opinion and functional limitations provided by Dr. Clifford, and as discussed above, did not err in evaluating the medical opinion source evidence in general, except in regard to that concerning plaintiff's asthma/bronchitis/allergies at step two discussed above.

IV.   The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility

REPORT AND RECOMMENDATION - 20

determination. <u>Allen</u>, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. <u>Id.</u> at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>; <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Lester</u>, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. <u>Id.</u>

In terms of plaintiff's depression and anxiety at step two, the ALJ found in relevant part with respect to her credibility as follows:

> In her disability report in March 2006, the claimant alleged that she could not work because she got panic attacks with little stress (Exhibit 10E).  At the hearing, the claimant testified that she could not work because of chronic anxiety.  She reported being clean and sober since December 2005.

REPORT AND RECOMMENDATION - 21

I find that the claimant's mental complaints are not credible. First, despite her claim of sobriety, she is currently still smoking marijuana. Although she is being prescribed medical marijuana by one of her doctors for alleged chronic pain, I find . . . little objective medical evidence to justify such a prescription. Second, even accepting her claim that she has been clean and sober from street drugs since December 2005, medical records during this period consistently document no significant mental health problems. For instance, in August 2006, she presented to an examination, with normal mood and affect (Exhibit 16F/3). In March and April 2007, she appeared well, was oriented times three, and had normal mood and affect (Exhibit 20F/26, 29). In August 2007, she denied any symptoms of depression or mania. She reported having no suicidal ideation. She did not appear impaired in any way (Exhibit 20F/19). In October 2007, she denied having any psychiatric issues. She was fully oriented and presented with normal mood and affect (Exhibit 20F/9-10). In November 2007, she was oriented times three and had normal mood and affect. Her recent memory, remote memory, judgment, and insight were all intact (Exhibit 20F/2). In April 2008, she appeared mildly and moderate [sic] anxious about her daughter being sick, she herself appeared fine (Exhibit 22F/36). In October 2008, she had no psychiatric problems. She was fully oriented and had normal mood, affect and mental status (Exhibit 22F/21). In January 2009, she appeared well, with full orientation and normal mood and affect (Exhibit 22F/6, 11). Third, despite her claims of chronic mental symptoms, she has not undergone any mental health treatment since she was discharged from Peninsula Mental Health in November 2004. Finally, her activities are not consistent with someone who is functioning abnormally from a mental standpoint. She cares for her personal needs, uses public transportation, manages her finances, reads a lot of spiritual books daily, and watches television (Exhibit 15E). At the hearing, she testified that she had worked as a personal companion to an elderly gentleman for nine months in 2008 in exchange for food and rent. She stated that she left this position only because the old man became abusive to her infant. She reported that she cared for the needs of her three year old child, over whom she had full custody. She stated that she received some help from friends and family with the child and in keeping her place clean, doing dishes, and shopping. However, she was adamant that she properly cared for her little girl and did not allow her apartment to become so dirty it would be a danger to her daughter. In addition, she spent time with a few friends and visited her adult son, grandson, and godfather.

Tr. 23-24.

Plaintiff first takes issue with the ALJ's statement that there is little objective evidence in the record that justified a prescription for medical marijuana. Specifically, plaintiff points to the

REPORT AND RECOMMENDATION - 22

written notation from the prescribing physician that medical marijuana may treat "some types of intractable pain," that her chronic pain has been documented in the record, and that the statement by the ALJ demonstrates a lack of understanding of the medical marijuana statute and amounts to an unsupported accusation that the prescribing physician had committed a crime. (ECF #14, p. 17 (quoting Tr. 455)); see also Tr. 404, 415, 418, 422. As for these last two accusations, plaintiff points to no actual evidence in the record to support them – nor does the undersigned find any – and, in any event, whether or not the ALJ understood the applicable statute or felt the prescribing physician to have committed a crime is irrelevant to the Court's analysis here.

Rather, the issue is whether the objective medical evidence in the record in fact supports a prescription for medical marijuana for plaintiff's chronic pain, which the undersigned finds the ALJ properly answered in the negative. As the ALJ went on to find in relevant part with respect to plaintiff's credibility in regard to her chronic pain complaints:

> . . . Although the claimant complaints of chronic, disabling arthralgias, the objective findings do not corroborate her allegations. For instance, in May 2006, she had a normal examination of the back, neck, and extremities. There was no evidence of motor or sensory deficits (Exhibit 16F/3). In February 2007, she had intact sensory and motor functioning (Exhibit 20F/31). In April and May 2007, she was seen for right foot and wrist pain (Exhibit 20F/23, 26). These problems resolved by June 2007, when she complained of abdominal tenderness, but otherwise had a normal examination (Exhibit 20F/21). In August 2007, Emily Glasscock, ARNP, observed the claimant move around the exam room quickly, without signs of acute pain. Although the claimant seemed concerned about her health, she did not appear impaired in any way (Exhibit 20F/19). In September 2007, she did not complain of any musculoskeletal issues (Exhibit 20F/9). In November 2007, she . . . had no musculoskeletal problems (Exhibit 21F/7). In February 2008, she reported some lower back pain, but was otherwise doing well (Exhibit 21F/12). . . . From June 2008 through December 2008, her chief complaint was right knee pain (Exhibit 22F/13-28). Of note is that an MRI of the right knee in July 2008 was essentially normal. Also of note is that, in October 2008, a physical examination was unremarkable (Exhibit 22F/21). In January 2009, the claimant was seen for only a right wrist burn, which was noted later that month to be healing well (Exhibit 22F/6, 8).

REPORT AND RECOMMENDATION - 23

Tr. 26-27.  The ALJ thus adequately supported her determination that the objective medical

evidence did not support the alleged need for medical marijuana in this case, or, for that matter,

the above physician's decision to prescribe it in the first place.  See Regennitter v. Commissioner

of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are not

consistent with clinical observations can satisfy clear and convincing requirement); see also

Batson, 359 F.3d at 1195 (ALJ need not accept medical opinion if it is inadequately supported by

record as whole); Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.  In addition, the fact

that medical marijuana may in general treat some kinds of intractable pain or that she was noted

to have pain by some of her medical providers, alone is insufficient to overcome the real lack of

objective support for the necessity for medical marijuana here as noted by the ALJ.

        Plaintiff also challenges the ALJ's determination to discount her credibility in part due to

the lack of evidence regarding "significant mental health problems" in the record and concerning

any mental health treatment therefor.  Tr. 23-24.  As discussed above with respect to step two,

though, the record supports the ALJ's credibility determination here.  As such, these too are valid

reasons for discounting plaintiff's credibility.

        Plaintiff next challenges the ALJ's statement, set forth above, that her activities of daily

living support an adverse credibility determination as well in regard to her mental impairments.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or

her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is

able to spend a substantial part of his or her day performing household chores or other activities

that are transferable to a work setting."  Id. at 1284 n.7.  The claimant need not be "utterly

incapacitated" to be eligible for disability benefits, however, and "many home activities may not

be easily transferable to a work environment."  Id.

REPORT AND RECOMMENDATION - 24

1    Plaintiff argues the activities the ALJ listed in her decision and set forth above is actually

2    an attempt by the ALJ to "color" her "as a person who is extremely active" by "simply reciting a

3    laundry list of her activities," which she fails to explain how exactly they are not consistent with

4    a diagnosis of mental illness. (ECF #14, p. 18).   The issue, however, is not whether those

5    activities are inconsistent therewith, but whether they are inconsistent with a claim of disability

6    based on such a diagnosis.   While not all the activities the ALJ cites are clearly indicative of an

7    ability to work – for example, it is uncertain the extent to which plaintiff received help with her

8    household chores, and, as discussed below, exactly what tasks she performed as a personal

9    assistant – it was not remiss of the ALJ to find that taking care of a minor child was indicative

10   thereof, particularly since, as noted by the ALJ, "she was adamant that she properly cared" for

11   that child. Tr. 24.   In addition, the ALJ properly noted the ability to take care of her child

12   suggested she was "capable of greater physical functioning than alleged." Tr. 28.

13

14       The ALJ, furthermore, has provided a number of other valid reasons for finding plaintiff

15   to be less than fully credible.   For example, the ALJ noted that the record contained evidence of

16   "drug seeking behavior," including with respect to both the narcotic medications and the medical

17   marijuana she allegedly took for disabling chronic pain. Tr. 27; see Edlund v. Massanari, 253

18   F.3d 1152, 1157 (9th Cir. 2001) (ALJ properly considered drug-seeking behavior).   The ALJ also

19   pointed out that plaintiff "provided inconsistent statements regarding her substance use" and

20   "work history," both of which undercut her credibility. Tr. 28; see Smolen, 80 F.3d at 1284 (ALJ

21   may consider ordinary techniques of credibility evaluation such as prior inconsistent statements

22   and other testimony that appears less than candid).   Lastly, the ALJ noted there was evidence of

23   "secondary gain motivation" and "a poor work history," again both of which properly may be

24   used to discount a claimant's credibility. Tr. 28-29; see Tidwell v. Apfel, 161 F.3d 599, 602 (9th

25

26

REPORT AND RECOMMENDATION - 25

Cir. 1998) (ALJ may consider motivation and issue of secondary gain; <u>Matney on Behalf of</u>

<u>Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir. 1992) (same); <u>Thomas v. Barnhart</u>, 278 F.3d

947, 959 (9th Cir. 2002) (no error in finding extremely poor work history and lack of propensity

to work in lifetime negatively affected credibility).

V.      The ALJ's Step Four Analysis

        If a disability determination "cannot be made on the basis of medical factors alone at step

three of the evaluation process," the ALJ must identify the claimant's "functional limitations and

restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p,

1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at

step four to determine whether he or she can do his or her past relevant work, and at step five to

determine whether he or she can do other work. <u>Id.</u>  It thus is what the claimant "can still do

despite his or her limitations." <u>Id.</u>

        A claimant's residual functional capacity is the maximum amount of work the claimant is

able to perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's

inability to work must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the

ALJ must consider only those limitations and restrictions "attributable to medically determinable

impairments." <u>Id.</u>  In assessing a claimant's RFC, the ALJ also is required to discuss why the

claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be

accepted as consistent with the medical or other evidence." <u>Id.</u> at *7.

        As noted above, after step three but before step four, the ALJ assessed plaintiff with the

residual functional capacity to perform the full range of light work. Tr. 25.  Based on that RFC

assessment and the vocational expert's testimony, the ALJ found at step four that plaintiff had

"worked as a personal attendant for an elderly gentleman in 2008 for nine months," that "this

REPORT AND RECOMMENDATION - 26

was long enough," according to the vocational expert, for her "to acquire the necessary skills for that job," and that therefore she could return to it. Tr. 30.  Plaintiff, who has the burden to show she is unable to return to her past relevant work, argues the ALJ erred in finding her capable of doing so, because she did not perform the above job at substantial gainful activity levels in light of the fact that she did not receive any earnings therefrom. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Earnings levels, however, create only a presumption that a job will be found to constitute or not constitute substantial gainful activity. See 20 C.F.R. § 416.974(b).  A claimant's earnings, in other words, "are not the end of the inquiry." Soria v. Callahan, 16 F. Supp.2d 1145, 1149 (C.D. Cal. 1997).  Rather, "[s]ubstantial work activity" is defined "as work that 'involves doing significant physical or mental activities' and 'is the kind of work usually done for pay or profit.'" Id. (quoting 20 C.F.R. § 416.972(a), (b)).  As such, "'[w]ork may be substantial even if it is done on a part-time basis.'" Id. (quoting Byington v. Chater, 76 F.3d 246, 250 (9th Cir. 1996)).  Work also may be "gainful if it is the kind . . . usually done for pay or profit, whether or not a profit is realized.'" Id. at 1150 (quoting 20 C.F.R. §§ 404.1572(b), 416.972(b)).

The fact that plaintiff may not have actually received any earnings from being a personal assistant, therefore, is  not definitive on the issue of whether or not that job constitutes significant gainful activity.  That being said, the undersigned finds the record in this case is entirely unclear as to exactly what work tasks plaintiff did as a personal assistant.  For example, plaintiff testified at the hearing that she was the elderly gentleman's "companion, not a caretaker," that he could walk and take care of himself and that she moved in with him because he had "a tendency to fall down sometimes and was afraid to be by himself." Tr. 466-67.  While the vocational expert did testify that "the work [plaintiff] described would probably best fit into personal attendant" (Tr.

498), nothing in plaintiff's testimony – on which the vocational expert clearly relied – indicates

exactly what the tasks were, if any, that she actually performed at the time.  Thus, it is not clear

that the vocational expert's testimony, and therefore the ALJ's step four finding, is supported by

the substantial evidence in the record.

VI.    The ALJ's Determination at Step Five

    If a claimant cannot perform his or her past relevant work, at step five of the disability

evaluation process the ALJ must show there are a significant number of jobs in the national

economy the claimant is able to do. See Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 416.920(d),

(e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101;

Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).  The Grids may be used, though, only

if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101

(emphasis in the original).  That is, the claimant "must be able to perform the *full range* of jobs

in a given category." Id. (emphasis in original).  However, if the claimant "has significant non-

exertional impairments," reliance on the Grids is not appropriate.[8] Ostenbrock, 240 F.3d at 1162;

see also Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit

claimant's functional capacity in ways not contemplated by Grids).

    In this case, the ALJ found in the alternative that in the event plaintiff's job as a personal

attendant was not past relevant work, based on her residual functional capacity for performing

the full range of light work, and considering her age, education and work experience, "a finding

of 'not disabled'" was "directed by" Grid Rule 202.21. Tr. 31.  Plaintiff argues the ALJ erred in

_____

[8] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

REPORT AND RECOMMENDATION - 28

failing to take into consideration any of the significant non-exertional limitations found by the medical sources in the record addressed above.  As discussed above, though, the only error made by the ALJ here was in regard to the environmental limitations found by Dr. Hoskins concerning avoiding concentrated exposure to fumes, dusts, order, gases, and poor ventilation.

The Ninth Circuit, however, has noted that the "[i]nability to tolerate dust or fumes is one example given in the [medical-vocational] guidelines of an environmental restriction not factored into the [Grid] Rules." Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)).  Accordingly, while it is unclear whether the need to avoid "concentrated" exposure constitutes an "inability" as described by the Ninth Circuit in Kail, such a limitation certainly would appear to have at least some significance in terms of the ability of an individual to perform the full range of light work as contemplated by the Grids.  Thus, it cannot be said definitively that application of the Grids was appropriate here.  Nor did the ALJ elicit any testimony from the vocational expert in regard to plaintiff's ability to perform other jobs existing in significant numbers in the national economy at this step, thereby making the ALJ's entire step five determination suspect.

VII.   Remand for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

REPORT AND RECOMMENDATION - 29

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain in regard to the severity of plaintiff's asthma/bronchitis/allergies at step two of the sequential disability evaluation process, plaintiff's ability to perform her job as a personal assistant at step four and the impact of any assessed environmental limitations on her ability to perform other jobs existing in significant numbers in the national economy at step five, this matter should be remanded to defendant for further administrative proceedings.

<u>CONCLUSION</u>

Based on the foregoing discussion, the undersigned recommends the Court find that the ALJ improperly concluded plaintiff was not disabled, and that it therefore reverse the ALJ's decision and remand this matter for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this

REPORT AND RECOMMENDATION - 30

matter for consideration on **December 17, 2010**, as noted in the caption.

DATED this 2nd day of December, 2010.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 31